### UNITED STATES

v.

**Edward BELLINGER, Defendant**

**No. 02–CR–644.**

United States District Court,
E.D. Pennsylvania.

Nov. 4, 2004.

Louis T. Savino, Jr., Philadelphia, PA, for Defendant.

## EXPLANATION AND ORDER

ANITA B. BRODY, District Judge.

Currently before me is defendant Bellinger's motion to suppress physical evidence. For the following reasons, this motion is denied.

### BACKGROUND

Defendant Bellinger is charged with one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). Bellinger moves to suppress evidence of the firearm, a black Beretta .40–caliber handgun. At the hearing on this motion to suppress,[1] I found that on the night of April 2, 2002, Philadelphia Police Officer Ronald Green and his partner David Beckett observed a burgundy Oldsmobile with tinted windows. (Tr. 8/23/04 at 102–03.) Green had heard radio flash descriptions of a red, medium-sized vehicle with tinted windows that was alleg-

edly involved in a rash of prior robberies and aggravated assaults, some of which involved gunshots at police officers. (Id. at 103.) These flash descriptions began in December 2001 and continued through March 2002. (Id.) There was no evidence introduced as to whether any of these incidents occurred immediately prior to April 2, 2002 nor a description of the alleged assailants. (Id.)

Upon seeing the burgundy Oldsmobile, Green pulled over the vehicle. (Tr. 8/23/04 at 103.) Green testified that he knew tinted windows were illegal in Pennsylvania. (Id.) However, I found that he pulled over the vehicle because he believed it fit the flash description, not because tinted windows are illegal in Pennsylvania. (Id. at 104.)

Green and Beckett approached the car and asked the occupants for their identification. (Id.) When the rear seat passenger could not produce his identification, Beckett asked him to step out of the car. (Id. at 105.) As the rear passenger exited the car, a gun fell from his pant leg. (Id.) Green then ordered the driver and Bellinger, who was sitting in the front passenger seat, to exit the car at gun point. Green patted them down, placed them in handcuffs and had them lie on the ground. (Id.) At this time, Green, standing outside of the car, looked into the car through the front passenger's open door and saw the butt of a gun protruding from the front passenger's seat. (Id.) This is the gun that Bellinger is charged with possessing.

At the hearing I requested additional briefs from the parties addressing the following three issues:

One, the initial pulling over of the burgundy car, what was legally required to do this, was this legal standard met, how

---

1. A copy of my factual findings is attached to this order.

was it met or not met? Two, assuming the pull over was legal, was ordering the rear passenger out of the car legal? . . . Three, after the gun was discovered in the rear passenger's person, was taking custody of the driver and the defendant legal?

(Tr. 8/23/04 at 106.)

## DISCUSSION

### Initial Stop of the Car

■ As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. *Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). In *Whren,* the Court held that the constitutionality of a traffic stop does not depend on the subjective intent of the officer involved. The Court stated that "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Id.* at 813, 116 S.Ct. 1769 (internal citations omitted). Hence, as long as there existed probable cause to believe that a traffic violation occurred, an officer can legally stop a car, even if the officer's actual purpose for stopping the car does not involve the traffic violation.

■ In the instant case, there was a visible traffic violation in that the Oldsmobile's windshield was tinted in violation of section 4524 of the Pennsylvania Vehicle Code. 75 Pa.C.S.A. § 4524.[2] Under *Whren,* as long as there objectively was probable cause to believe that a traffic

violation occurred, it does not matter that Green's actual reason for stopping the car was its similarity to the flash description. Therefore, I find that the initial stop of the car did not violate the Fourth Amendment.

### Ordering the Rear Passenger Out of the Car

■ In *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), the Court held that once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment, even in the absence of any unusual or suspicious behavior on the part of the driver. *Id.* at 109, 111 n. 6. The Court expanded this holding to include passengers in *Maryland v. Wilson,* 519 U.S. 408, 414–15, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) ("We therefore hold that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop."). Under *Mimms* and *Wilson,* Green and Beckett were free to order the rear passenger of the burgundy Oldsmobile to exit the car without violating the Fourth Amendment.

### Taking Custody of Bellinger and the Driver

■ Bellinger argues that Green effectively placed Bellinger under arrest, and therefore needed probable cause, when Green ordered Bellinger out of the car by gunpoint, handcuffed him, and made him lie on the ground. The government, on the other hand, seems to argue that these actions were among the reasonable steps that an officer may make to secure his

---

2. Any tinting which does not "permit a person to see or view the inside of the vehicle through the windshield, side wing or side window of the vehicle" is prohibited. 75 Pa.C.S.A. § 4524. Green testified, and Bel-

linger did not contest, that the tinting in the burgundy Oldsmobile did not permit one to see the inside of the car through the windshield. (Tr. 8/23/04 at 8.)

safety during an investigatory stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■ I do not deed to decide whether these actions constituted a full-fledged arrest of Bellinger or merely an investigatory stop under *Terry*. Under *Mimms* and *Wilson*, Green could order Bellinger and the driver to get out of the car without violating the Fourth Amendment. Once Bellinger was out of the car, the butt of the gun was in plain view[3] through the open door from outside of the car. Therefore, the gun was not seized in violation of the Fourth Amendment.

### CONCLUSION

For the reasons set forth above, defendant Bellinger's motion to suppress physical evidence is denied.

### ORDER

**AND NOW**, this _____ day of November 2004, it is **ORDERED** that Defendant's Motion to Suppress Physical Evidence (Docket # 19) is **DENIED**.

### ATTACHMENT

### FINDINGS OF FACT

### EDWARD BELLINGER'S MOTION TO SUPPRESS

Mr. Bellinger's motion to suppress alleges that the search and seizure which resulted in the police seizing a gun from the front passenger seat of the car in which defendant was riding violated defendant's Fourth Amendment rights.

The government called 2 witnesses in support of its position that the search and seizure were legal. The government's first witness was Philadelphia Police Officer Ron Green.

- Officer Green has been a police officer in the 18th district in Philadelphia for 7.5 years. The 18th district extends from 63rd street to the Schuylkill River, and from Market Street to Baltimore Pike. On April 2, 2002, Officer Green was assigned to plain clothes duty from 4 pm to midnight in an unmarked vehicle along with his partner Officer David Beckett.

- At 8:40 PM on that night, he and Officer Beckett were traveling southbound on the 700 block of 52nd street. Officer Green observed at that time a Burgandy Oldsmobile with tinted windows and with the license plate number ENP7632. The Oldsmobile was also traveling southbound on 52nd street.

- Officer Green had heard flash descriptions of an automobile described as a red, medium sized vehicle with tinted windows. This vehicle was described in radio calls as having been used in a rash of prior robberies and aggravated assaults, including firing on police officers. Reports about this vehicle began in December 2001 and continued through March 2002. No evidence was introduced as to whether any of these incidents occurred immediately prior to April 2, 2002. There was also no evidence as to where in the 18th district these incidents occurred. There was no description of the alleged assailants in the radio call.

- Upon seeing the Burgandy Oldsmobile, Officer Green activated his vehicle's sirens and radioed for a marked police vehicle to assist him and Officer Beckett.

---

**3.** The plain view doctrine authorizes the seizure of "illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." *Illinois v. Andreas*, 463 U.S. 765, 771, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983).

- Officer Green testified that he now knew that tinted windows were illegal in Pennsylvania. He testified that he pulled the Burgandy vehicle over because of the combined reason of the tinted windows and the flash description.

- Officer Green did not describe the tinted windows in either the Incident Report he wrote about this incident or the Investigation Report he assisted a detective in preparing.

- The officers pulled the Burgandy car over because Officer Green believed it fit the flash description. They did not pull the car over because tinted windows are illegal in Pennsylvania.

- The driver of the Burgandy vehicle pulled over under a street light. Officer Green saw shadows of movement within the vehicle which suggested to him that people were moving forward and backwards and side to side. However, he could not tell how many people were in the vehicle. Officer Green testified that the movement within the vehicle made him feel "uneasy".

- Officer Green then approached the driver's side of the vehicle and asked the vehicle's occupants to put all the windows down. The occupants complied with this request. Officer Green was then able to observe that there were three people in the vehicle: a female driver, a male front seat passenger and another male passenger in the rear, behind the passenger seat.

- Officer Green asked the driver for her license, registration and insurance information.

- The driver produced a driver's license but no other papers. The officers asked the driver who owned the car and she said she did not know. The passenger in the front seat, identified as the defen-dant, Edward Bellinger, told the officer that the car was owned by a friend of his.

- Officer Beckett questioned the rear passenger. This passenger was unable to produce identification. Office Beckett ordered this passenger out of the vehicle. At this time, a Smith & Wesson 45 caliber pistol with 8 live rounds fell from the rear passenger's pant leg.

- Officer Beckett then yelled of Officer Green that the rear passenger had a gun. Officer Green then told all three occupants to put their hands up. Officer Green ordered defendant out of the vehicle at gunpoint and patted him down. Officer Green did not find any contraband on defendant. He than put defendant in handcuffs and had him lie down on the ground.

- At this time, Officer Green, standing outside of the vehicle, looked into the vehicle through the front passenger's open door. Officer Green observed the butt of a gun protruding from the side of the front passenger's seat. Officer Green has observed guns "a number of times" and had no doubt as to what the gun was. Officer Green recovered the gun and found it to be a Black Beretta 40 calibre pistol with 11 live rounds.

- The driver of the vehicle was let go at the scene. No motor vehicle citations or summons were issued to the driver.