## WHREN ET AL. *v.* UNITED STATES

No. 95–5841.   Argued April 17, 1996—Decided June 10, 1996

SCALIA, J., delivered the opinion for a unanimous Court.

*Lisa Burget Wright* argued the cause for petitioners. With her on the briefs were *A. J. Kramer, Neil H. Jaffee,* and *G. Allen Dale.*

*James A. Feldman* argued the cause for the United States. On the brief were *Solicitor General Days, Acting Assistant Attorney General Keeney, Deputy Solicitor General Dreeben,* and *Paul A. Engelmayer.*\*

---

\*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union by *Steven R. Shapiro* and *Susan N. Herman;* and for the National Association of Criminal Defense Lawyers by *Natman Schaye* and *Walter B. Nash III.*

Briefs of *amici curiae* urging affirmance were filed for the Criminal Justice Legal Foundation by *Kent S. Scheidegger* and *Charles L. Hobson;* and for the State of California et al. by *Daniel E. Lungren,* Attorney General of California, *George Williamson,* Chief Assistant Attorney General, *Ronald A. Bass,* Senior Assistant Attorney General, *Joan Killeen* and *Catherine A. Rivlin,* Supervising Deputy Attorneys General, and *Christina V. Kuo,* Deputy Attorney General; and by the Attorneys General for their respective States as follows: *M. Jane Brady* of Delaware,

JUSTICE SCALIA delivered the opinion of the Court.

In this case we decide whether the temporary detention of a motorist who the police have probable cause to believe has committed a civil traffic violation is inconsistent with the Fourth Amendment's prohibition against unreasonable seizures unless a reasonable officer would have been motivated to stop the car by a desire to enforce the traffic laws.

## I

On the evening of June 10, 1993, plainclothes vice-squad officers of the District of Columbia Metropolitan Police Department were patrolling a "high drug area" of the city in an unmarked car. Their suspicions were aroused when they passed a dark Pathfinder truck with temporary license plates and youthful occupants waiting at a stop sign, the driver looking down into the lap of the passenger at his right. The truck remained stopped at the intersection for what seemed an unusually long time—more than 20 seconds. When the police car executed a U-turn in order to head back toward the truck, the Pathfinder turned suddenly to its right, without signaling, and sped off at an "unreasonable" speed. The policemen followed, and in a short while overtook the Pathfinder when it stopped behind other traffic at a red light. They pulled up alongside, and Officer Ephraim Soto stepped out and approached the driver's door, identifying himself as a police officer and directing the driver, petitioner Brown, to put the vehicle in park. When Soto drew up to the driver's

*Thomas J. Miller* of Iowa, *Carla J. Stovall* of Kansas, *J. Joseph Curran, Jr.,* of Maryland, *Mike Moore* of Mississippi, *Frankie Sue Del Papa* of Nevada, *Deborah T. Poritz* of New Jersey, *Dennis C. Vacco* of New York, *Michael F. Easley* of North Carolina, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Charles W. Burson* of Tennessee, and *Jan Graham* of Utah.

*Richard S. Michaels* and *Jeff Rubin* filed a brief for the California District Attorney's Association as *amicus curiae.*

window, he immediately observed two large plastic bags of what appeared to be crack cocaine in petitioner Whren's hands. Petitioners were arrested, and quantities of several types of illegal drugs were retrieved from the vehicle.

Petitioners were charged in a four-count indictment with violating various federal drug laws, including 21 U. S. C. §§ 844(a) and 860(a). At a pretrial suppression hearing, they challenged the legality of the stop and the resulting seizure of the drugs. They argued that the stop had not been justified by probable cause to believe, or even reasonable suspicion, that petitioners were engaged in illegal drug-dealing activity; and that Officer Soto's asserted ground for approaching the vehicle—to give the driver a warning concerning traffic violations—was pretextual. The District Court denied the suppression motion, concluding that "the facts of the stop were not controverted," and "[t]here was nothing to really demonstrate that the actions of the officers were contrary to a normal traffic stop." App. 5.

Petitioners were convicted of the counts at issue here. The Court of Appeals affirmed the convictions, holding with respect to the suppression issue that, "regardless of whether a police officer subjectively believes that the occupants of an automobile may be engaging in some other illegal behavior, a traffic stop is permissible as long as a reasonable officer in the same circumstances *could have* stopped the car for the suspected traffic violation." 53 F. 3d 371, 374–375 (CADC 1995). We granted certiorari. 516 U. S. 1036 (1996).

II

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a "seizure" of "persons" within the

meaning of this provision. See *Delaware* v. *Prouse*, 440 U. S. 648, 653 (1979); *United States* v. *Martinez-Fuerte*, 428 U. S. 543, 556 (1976); *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 878 (1975). An automobile stop is thus subject to the constitutional imperative that it not be "unreasonable" under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. See *Prouse, supra*, at 659; *Pennsylvania* v. *Mimms*, 434 U. S. 106, 109 (1977) *(per curiam)*.

Petitioners accept that Officer Soto had probable cause to believe that various provisions of the District of Columbia traffic code had been violated. See 18 D. C. Mun. Regs. §§ 2213.4 (1995) ("An operator shall . . . give full time and attention to the operation of the vehicle"); 2204.3 ("No person shall turn any vehicle . . . without giving an appropriate signal"); 2200.3 ("No person shall drive a vehicle . . . at a speed greater than is reasonable and prudent under the conditions"). They argue, however, that "in the unique context of civil traffic regulations" probable cause is not enough. Since, they contend, the use of automobiles is so heavily and minutely regulated that total compliance with traffic and safety rules is nearly impossible, a police officer will almost invariably be able to catch any given motorist in a technical violation. This creates the temptation to use traffic stops as a means of investigating other law violations, as to which no probable cause or even articulable suspicion exists. Petitioners, who are both black, further contend that police officers might decide which motorists to stop based on decidedly impermissible factors, such as the race of the car's occupants. To avoid this danger, they say, the Fourth Amendment test for traffic stops should be, not the normal one (applied by the Court of Appeals) of whether probable cause existed to justify the stop; but rather, whether a police officer, acting reasonably, would have made the stop for the reason given.

## A

Petitioners contend that the standard they propose is consistent with our past cases' disapproval of police attempts to use valid bases of action against citizens as pretexts for pursuing other investigatory agendas. We are reminded that in *Florida* v. *Wells*, 495 U. S. 1, 4 (1990), we stated that "an inventory search[1] must not be a ruse for a general rummaging in order to discover incriminating evidence"; that in *Colorado* v. *Bertine*, 479 U. S. 367, 372 (1987), in approving an inventory search, we apparently thought it significant that there had been "no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation"; and that in *New York* v. *Burger*, 482 U. S. 691, 716–717, n. 27 (1987), we observed, in upholding the constitutionality of a warrantless administrative inspection,[2] that the search did not appear to be "a 'pretext' for obtaining evidence of . . . violation of . . . penal laws." But only an undiscerning reader would regard these cases as endorsing the principle that ulterior motives can invalidate police conduct that is justifiable on the basis of probable cause to believe that a violation of law has occurred. In each case we were addressing the validity of a search conducted in the *absence* of probable cause. Our quoted statements simply explain that the exemption from the need for probable cause (and warrant), which is accorded to searches made for the purpose of inventory or administrative

---

[1] An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage. See *South Dakota* v. *Opperman*, 428 U. S. 364, 369 (1976).

[2] An administrative inspection is the inspection of business premises conducted by authorities responsible for enforcing a pervasive regulatory scheme—for example, unannounced inspection of a mine for compliance with health and safety standards. See *Donovan* v. *Dewey*, 452 U. S. 594, 599–605 (1981).

regulation, is not accorded to searches that are *not* made for those purposes. See *Bertine, supra,* at 371–372; *Burger, supra,* at 702–703.

Petitioners also rely upon *Colorado* v. *Bannister,* 449 U. S. 1 (1980) *(per curiam),* a case which, like this one, involved a traffic stop as the prelude to a plain-view sighting and arrest on charges wholly unrelated to the basis for the stop. Petitioners point to our statement that "[t]here was no evidence whatsoever that the officer's presence to issue a traffic citation was a pretext to confirm any other previous suspicion about the occupants" of the car. *Id.,* at 4, n. 4. That dictum *at most* demonstrates that the Court in *Bannister* found no need to inquire into the question now under discussion; not that it was certain of the answer. And it may demonstrate even less than that: If by "pretext" the Court meant that the officer really had not seen the car speeding, the statement would mean only that there was no reason to doubt probable cause for the traffic stop.

It would, moreover, be anomalous, to say the least, to treat a statement in a footnote in the *per curiam Bannister* opinion as indicating a reversal of our prior law. Petitioners' difficulty is not simply a lack of affirmative support for their position. Not only have we never held, outside the context of inventory search or administrative inspection (discussed above), that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment; but we have repeatedly held and asserted the contrary. In *United States* v. *Villamonte-Marquez,* 462 U. S. 579, 584, n. 3 (1983), we held that an otherwise valid warrantless boarding of a vessel by customs officials was not rendered invalid "because the customs officers were accompanied by a Louisiana state policeman, and were following an informant's tip that a vessel in the ship channel was thought to be carrying marihuana." We flatly dismissed the idea that an ulterior motive might serve to strip the agents of their legal justification. In *United States* v. *Robinson,* 414 U. S. 218 (1973), we held that

a traffic-violation arrest (of the sort here) would not be rendered invalid by the fact that it was "a mere pretext for a narcotics search," *id.*, at 221, n. 1; and that a lawful post-arrest search of the person would not be rendered invalid by the fact that it was not motivated by the officer-safety concern that justifies such searches, see *id.*, at 236. See also *Gustafson* v. *Florida*, 414 U. S. 260, 266 (1973). And in *Scott* v. *United States*, 436 U. S. 128, 138 (1978), in rejecting the contention that wiretap evidence was subject to exclusion because the agents conducting the tap had failed to make any effort to comply with the statutory requirement that unauthorized acquisitions be minimized, we said that "[s]ubjective intent alone . . . does not make otherwise lawful conduct illegal or unconstitutional." We described *Robinson* as having established that "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." 436 U. S., at 136, 138.

We think these cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved. We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.

B

Recognizing that we have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers, petitioners disavow any intention to make the individual officer's subjective good faith the touchstone of "reasonableness." They insist that the stand-

ard they have put forward—whether the officer's conduct deviated materially from usual police practices, so that a reasonable officer in the same circumstances would not have made the stop for the reasons given—is an "objective" one.

But although framed in empirical terms, this approach is plainly and indisputably driven by subjective considerations. Its whole purpose is to prevent the police from doing under the guise of enforcing the traffic code what they would like to do for different reasons. Petitioners' proposed standard may not use the word "pretext," but it is designed to combat nothing other than the perceived "danger" of the pretextual stop, albeit only indirectly and over the run of cases. Instead of asking whether the individual officer had the proper state of mind, the petitioners would have us ask, in effect, whether (based on general police practices) it is plausible to believe that the officer had the proper state of mind.

Why one would frame a test designed to combat pretext in such fashion that the court cannot take into account *actual and admitted pretext* is a curiosity that can only be explained by the fact that our cases have foreclosed the more sensible option. If those cases were based only upon the evidentiary difficulty of establishing subjective intent, petitioners' attempt to root out subjective vices through objective means might make sense. But they were not based only upon that, or indeed even principally upon that. Their principal basis—which applies equally to attempts to reach subjective intent through ostensibly objective means—is simply that the Fourth Amendment's concern with "reasonableness" allows certain actions to be taken in certain circumstances, *whatever* the subjective intent. See, *e. g., Robinson, supra,* at 236 ("Since it is the fact of custodial arrest which gives rise to the authority to search, it is of no moment that [the officer] did not indicate any subjective fear of the [arrestee] or that he did not himself suspect that [the arrestee] was armed") (footnotes omitted); *Gustafson, supra,* at 266 (same). But even if our concern had been only an evidentiary one,

petitioners' proposal would by no means assuage it.   Indeed, it seems to us somewhat easier to figure out the intent of an individual officer than to plumb the collective consciousness of law enforcement in order to determine whether a "reasonable officer" would have been moved to act upon the traffic violation.   While police manuals and standard procedures may sometimes provide objective assistance, ordinarily one would be reduced to speculating about the hypothetical reaction of a hypothetical constable—an exercise that might be called virtual subjectivity.

Moreover, police enforcement practices, even if they could be practicably assessed by a judge, vary from place to place and from time to time.   We cannot accept that the search and seizure protections of the Fourth Amendment are so variable, cf. *Gustafson, supra,* at 265; *United States* v. *Caceres,* 440 U. S. 741, 755–756 (1979), and can be made to turn upon such trivialities.   The difficulty is illustrated by petitioners' arguments in this case.   Their claim that a reasonable officer would not have made this stop is based largely on District of Columbia police regulations which permit plainclothes officers in unmarked vehicles to enforce traffic laws "only in the case of a violation that is so grave as to pose an *immediate threat* to the safety of others."   Metropolitan Police Department, Washington, D. C., General Order 303.1, pt. 1, Objectives and Policies (A)(2)(4) (Apr. 30, 1992), reprinted as Addendum to Brief for Petitioners.   This basis of invalidation would not apply in jurisdictions that had a different practice.   And it would not have applied even in the District of Columbia, if Officer Soto had been wearing a uniform or patrolling in a marked police cruiser.

Petitioners argue that our cases support insistence upon police adherence to standard practices as an objective means of rooting out pretext.   They cite no holding to that effect, and dicta in only two cases.   In *Abel* v. *United States,* 362 U. S. 217 (1960), the petitioner had been arrested by the Immigration and Naturalization Service (INS), on the basis of

an administrative warrant that, he claimed, had been issued on pretextual grounds in order to enable the Federal Bureau of Investigation (FBI) to search his room after his arrest. We regarded this as an allegation of "serious misconduct," but rejected Abel's claims on the ground that "[a] finding of bad faith is . . . not open to us on th[e] record" in light of the findings below, including the finding that " 'the proceedings taken by the [INS] differed in no respect from what would have been done in the case of an individual concerning whom [there was no pending FBI investigation],' " *id.*, at 226–227. But it is a long leap from the proposition that following regular procedures is some evidence of lack of pretext to the proposition that failure to follow regular procedures *proves* (or is an operational substitute for) pretext. *Abel,* moreover, did not involve the assertion that pretext could invalidate a search or seizure for which there was probable cause—and even what it said about pretext in other contexts is plainly inconsistent with the views we later stated in *Robinson, Gustafson, Scott,* and *Villamonte-Marquez.* In the other case claimed to contain supportive dicta, *United States* v. *Robinson,* 414 U. S. 218 (1973), in approving a search incident to an arrest for driving without a license, we noted that the arrest was "not a departure from established police department practice." *Id.,* at 221, n. 1. That was followed, however, by the statement that "[w]e leave for another day questions which would arise on facts different from these." *Ibid.* This is not even a dictum that purports to provide an answer, but merely one that leaves the question open.

### III

In what would appear to be an elaboration on the "reasonable officer" test, petitioners argue that the balancing inherent in any Fourth Amendment inquiry requires us to weigh the governmental and individual interests implicated in a traffic stop such as we have here. That balancing, petitioners claim, does not support investigation of minor traffic in-

fractions by plainclothes police in unmarked vehicles; such investigation only minimally advances the government's interest in traffic safety, and may indeed retard it by producing motorist confusion and alarm—a view said to be supported by the Metropolitan Police Department's own regulations generally prohibiting this practice. And as for the Fourth Amendment interests of the individuals concerned, petitioners point out that our cases acknowledge that even ordinary traffic stops entail "a possibly unsettling show of authority"; that they at best "interfere with freedom of movement, are inconvenient, and consume time" and at worst "may create substantial anxiety," *Prouse*, 440 U. S., at 657. That anxiety is likely to be even more pronounced when the stop is conducted by plainclothes officers in unmarked cars.

It is of course true that in principle every Fourth Amendment case, since it turns upon a "reasonableness" determination, involves a balancing of all relevant factors. With rare exceptions not applicable here, however, the result of that balancing is not in doubt where the search or seizure is based upon probable cause. That is why petitioners must rely upon cases like *Prouse* to provide examples of actual "balancing" analysis. There, the police action in question was a random traffic stop for the purpose of checking a motorist's license and vehicle registration, a practice that—like the practices at issue in the inventory search and administrative inspection cases upon which petitioners rely in making their "pretext" claim—involves police intrusion *without the probable cause that is its traditional justification.* Our opinion in *Prouse* expressly distinguished the case from a stop based on precisely what is at issue here: "probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations." *Id.,* at 661. It noted approvingly that "[t]he foremost method of enforcing traffic and vehicle safety regulations . . . is acting upon observed violations," *id.,* at 659, which afford the " 'quantum of individualized suspicion' " necessary to ensure that police

discretion is sufficiently constrained, *id.*, at 654–655 (quoting *United States* v. *Martinez-Fuerte,* 428 U. S., at 560). What is true of *Prouse* is also true of other cases that engaged in detailed "balancing" to decide the constitutionality of automobile stops, such as *Martinez-Fuerte,* which upheld checkpoint stops, see 428 U. S., at 556–562, and *Brignoni-Ponce,* which disallowed so-called "roving patrol" stops, see 422 U. S., at 882–884: The detailed "balancing" analysis was necessary because they involved seizures without probable cause.

Where probable cause has existed, the only cases in which we have found it necessary actually to perform the "balancing" analysis involved searches or seizures conducted in an extraordinary manner, unusually harmful to an individual's privacy or even physical interests—such as, for example, seizure by means of deadly force, see *Tennessee* v. *Garner,* 471 U. S. 1 (1985), unannounced entry into a home, see *Wilson* v. *Arkansas,* 514 U. S. 927 (1995), entry into a home without a warrant, see *Welsh* v. *Wisconsin,* 466 U. S. 740 (1984), or physical penetration of the body, see *Winston* v. *Lee,* 470 U. S. 753 (1985). The making of a traffic stop out of uniform does not remotely qualify as such an extreme practice, and so is governed by the usual rule that probable cause to believe the law has been broken "outbalances" private interest in avoiding police contact.

Petitioners urge as an extraordinary factor in this case that the "multitude of applicable traffic and equipment regulations" is so large and so difficult to obey perfectly that virtually everyone is guilty of violation, permitting the police to single out almost whomever they wish for a stop. But we are aware of no principle that would allow us to decide at what point a code of law becomes so expansive and so commonly violated that infraction itself can no longer be the ordinary measure of the lawfulness of enforcement. And even if we could identify such exorbitant codes, we do not know by what standard (or what right) we would decide, as

petitioners would have us do, which particular provisions are sufficiently important to merit enforcement.

For the run-of-the-mine case, which this surely is, we think there is no realistic alternative to the traditional common-law rule that probable cause justifies a search and seizure.

\* \* \*

Here the District Court found that the officers had probable cause to believe that petitioners had violated the traffic code. That rendered the stop reasonable under the Fourth Amendment, the evidence thereby discovered admissible, and the upholding of the convictions by the Court of Appeals for the District of Columbia Circuit correct. The judgment is

*Affirmed.*